IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

FILED
JAN 13 2015
Clerk, U.S. District Court
District Of Montana
Billings

UNITED STATES OF AMERICA,

Plaintiff,

vs.

JEVON H. MCDUFFIE,

Defendant.

CR 14-66-BLG-SPW

OPINION and ORDER

On January 5, 2013, Montana Highway Patrol Trooper Glenn Quinnell ("Trooper Quinnell") stopped a car driven by Defendant Jevon McDuffie ("McDuffie"). A subsequent search revealed methamphetamine hidden within the car. McDuffie moved to suppress the incriminating evidence on October 20, 2014. In the motion, McDuffie argues that Trooper Quinnell did not possess the requisite reasonable suspicion to stop his car. On November 5, this Court held a hearing on the motion. At the hearing, the Court heard testimony from Trooper Quinnell and McDuffie, and several exhibits were admitted into evidence. The Court also allowed the parties to submit supplemental briefing to address the additional issue of whether Trooper Quinnell unjustifiably extended the traffic stop. The Court now considers all the arguments and denies the motion.

1

## I. Background

Around 7:00 AM on January 5, 2014, Trooper Quinnell began his shift by entering Interstate 94 heading east at about mile marker 211 in his marked patrol car. Mile marker 211 is near Glendive, Montana. As Trooper Quinnell attempted to merge from the onramp onto I-94, he observed a vehicle driving in the right lane behind him. The vehicle moved to the passing lane to allow Trooper Quinnell to merge onto I-94. Trooper Quinnell did not see the vehicle use its turn signal when it switched lanes. The vehicle went past Trooper Quinnell and switched back to the right lane. Again, Trooper Quinnell did not see the vehicle use its turn signal. Trooper Quinnell followed the vehicle and noticed that it had trouble maintaining its lane. The vehicle crossed the centerline and generally swerved within the lane.

McDuffie claims that he properly signalled when changing lanes on both occasions. He also challenges Trooper Quinnell's assertion that the vehicle crossed the centerline. McDuffie correctly notes that the video from Trooper Quinnell's vehicle does not corroborate his testimony. However, the video does not start until after McDuffie moved back to the right lane and after Trooper Quinnell stated that he observed McDuffie cross the centerline. The Court finds Trooper Quinnell's testimony credible. Trooper Quinnell was a Highway Patrolman that was trained to notice such traffic violations. While McDuffie testified that he "absolutely" signalled, the hearing was 22 months after the traffic

stop. It would be difficult for a driver to remember whether he properly signalled on a specific instance; whereas Trooper Quinnell could rely on his report made contemporaneously with the stop.

Approximately a mile and half after Trooper Quinnell entered I-94, the vehicle properly signalled and exited I-94 at Exit 213. Exit 213 is where I-94 intersects with Highway 16. Travelling north on Highway 16 is the route to travel from Glendive to Sidney, Montana and Williston, North Dakota. At the time, there was a large problem with fatigued oil field workers driving in the Glendive area, particularly along Highway 16 headed to Sidney or Williston.

Trooper Quinnell followed the vehicle onto the off-ramp. After the vehicle turned north onto Highway 16, Trooper Quinnell activated his lights. The vehicle promptly pulled over. Trooper Quinnell observed that the vehicle had California license plates, and he called in the plate numbers to dispatch so that they could begin running a check on the car. At that time, Trooper Quinnell only intended to issue the driver a warning.

Trooper Quinnell approached the vehicle's passenger door and noticed fast food wrappers and no luggage in the back seat. Trooper Quinnell stated that in his training and experience, having no visible luggage and fast food wrappers in the back seat is consistent with drug couriers. When he reached the front passenger window, Trooper Quinnell identified himself and told the vehicle's driver,

McDuffie, that he appeared to be having trouble maintaining his lane. Trooper Quinnell also noticed for the first time that McDuffie was an African American. Trooper Quinnell asked McDuffie if he was falling asleep or was on his phone. McDuffie responded that he was trying to get the GPS on his phone to work. Trooper Quinnell asked where McDuffie was going. McDuffie stated that he was going to Williston to look for work.

Trooper Quinnell then asked for McDuffie's driver's license and the vehicle's paperwork. While McDuffie got the documents, Trooper Quinnell asked him if he had any luggage and where he was coming from. McDuffie responded that his luggage was in the trunk and that he was from Las Vegas. Trooper Quinnell told McDuffie that he appeared tired and asked if he had driven straight through from Las Vegas. McDuffie stated that he stopped a few times to sleep in his car. The fact that McDuffie drove from Las Vegas to Glendive while only stopping a few times to sleep in his car further heightened Trooper Quinnell's suspicions that more criminal activity may have been afoot.

McDuffie handed Trooper Quinnell the relevant documents, which included a rental agreement. Trooper Quinnell asked McDuffie who rented the car. McDuffie said that his girlfriend rented it for him. This further led Trooper Quinnell to suspect McDuffie's involvement in criminal activity. In his training and experience, Trooper Quinnell believed that drug traffickers frequently

travelled in rental cars. In Trooper Quinnell's nine years of experience, he had seized ten to fifteen rental vehicles that contained narcotics.

About two minutes after Trooper Quinnell initiated the stop, he returned to his patrol vehicle to run a records check on McDuffie. Trooper Quinnell ran a criminal history report on McDuffie and found that he possessed a valid driver's license and that there were no outstanding warrants for his arrest. In addition, the rental car was not reported stolen.

Trooper Quinnell noticed that McDuffie was not named in the rental agreement. Instead, the customer's name was Lisa Spinks. In his experience, Trooper Quinnell believed that rental car companies did not want people not listed in the rental agreement driving a rental car without the named customer in the car. Trooper Quinnell stated that he had "seized many vehicles for rental agencies that also did not have narcotics in them, because they don't want them being driven around the country by people who are not authorized to be in possession of them." At the hearing, McDuffie's counsel got Trooper Quinnell to admit that nothing in the rental agreement said that McDuffie could not drive the car. However, Trooper Quinnell was incorrect about the rental agreement. At the bottom of the rental agreement before Lisa Spinks's initials, the rental agreement states, "No additional drivers allowed without prior written consent." (Doc. 21-1). Despite Trooper Quinnell's inability to locate that section while testifying on cross-examination, he

was correct in his belief that rental companies only want authorized drivers to drive their vehicles.[1]

About seven and a half minutes after the stop and five and half minutes after he returned to his patrol car, Trooper Quinnell returned to McDuffie's passenger window. Trooper Quinnell told McDuffie that since his name was not on the rental agreement, Trooper Quinnell had to call the rental company, Avis, and see what they wanted to do with the car. Trooper Quinnell asked McDuffie if he was on probation, and McDuffie responded that he was not. McDuffie appeared frustrated and said that this was the second time he was pulled over on this trip. After talking to McDuffie for a minute, Trooper Quinnell returned to his patrol car.

Upon his return to the patrol car, dispatch provided Trooper Quinnell a brief statement of McDuffie's criminal history. The criminal history relayed by dispatch included a couple of charges involving marijuana and cocaine. Trooper Quinnell told dispatch that he suspected that McDuffie had a "load" in his vehicle. Trooper Quinnell also informed dispatch that he was going to call Avis.

Instead of calling Avis, Trooper Quinnell called Jeff Faycosh, the resident agent in charge of the Eastern Montana Drug Task Force. Trooper Quinnell described the situation to Agent Faycosh and said that McDuffie was driving a car

---

[1] Although never mentioned at the hearing, the return date and location on the rental agreement was listed as January 10, 2013 at Las Vegas. This appears to contradict McDuffie's claim that he intended to remain in Williston.

6

rented "by some chick." Trooper Quinnell wanted to give Agent Faycosh a "head's up" because he believed the car would be seized. Trooper Quinnell also asked Agent Faycosh how he wanted Trooper Quinnell to proceed. When asked for the driver's identification, Trooper Quinell stated it was "Jevon H. McDuffie, black male." When asked at the hearing why he volunteered to Agent Faycosh that McDuffie was black, Trooper Quinnell stated that he wanted Agent Faycosh to be apprised of all the circumstances involved so that there were not any surprises. Trooper Quinnell stated that a suspect's race is "something that does come up, is questioned at times. I'm just letting [Agent Faycosh] know what I have as best I can." The call to Agent Faycosh lasted about two and a half minutes.

Trooper Quinnell then called Avis and spoke to a representative. Trooper Quinnell identified himself and said that he had one of Avis's rental cars pulled over and that the driver was not listed on the rental agreement. Trooper Quinnell provided the car's license plate and said that it was rented to a woman not related to McDuffie. Trooper Quinnell did not tell the representative that McDuffie claimed to be in a relationship with Spinks. Trooper Quinnell also told the representative the McDuffie had a history of transporting drugs.

While Trooper Quinnell was on the phone with Avis, he began receiving McDuffie's criminal history on his patrol car's computer. Trooper Quinnell

received new information that McDuffie had been previously charged with stealing a rental car in Utah. Specifically, the criminal history reported stated:

```
Arrest Case Number   28620
Arresting Agency     UT0210000 SEVIER COUNTY SHERIFF
Subject's Name       MCDUFFIE, JEVON H
Charge
    Charge Literal THEFT OF RENTAL VEHICLE
        Statute (UNKNOWN )
    NCIC Offense Code 2499
    NCIC Offense Text STOLEN VEHICLE
        Counts 1
        Severity Felony
------------------------------------------------
Court Disposition    (Cycle 001)
Court Case Number    CONVERSION
Final Disposition Date 2011-10-25
Court Agency         UT0210000 SEVIER COUNTY SHERIFF
Charge               23092091
    Charge Literal THEFT OF RENTAL VEHICLE
        Statute THEFT OF RENTAL VEHICLE
                (UNKNOWN               )
        Severity Felony 2
        Disposition OTHER( 2011-10-25; WARRANT ISSUED)
*********************
```

(Doc. 21-3 at 20). The criminal history report did not list the disposition of the Theft of a Rental Vehicle charge and only stated that a warrant was issued. Later on the criminal history page for Utah, it stated:

> TOTAL NUMBER OF INCIDENTS1
> TOTAL NUMBER OF INCIDENTS WITH CONVICTIONS0
> TOTAL NUMBER OF INCIDENTS WITH A FELONY1
> TOTAL NUMBER OF INCIDENTS WITH FELONY CONVICTION0

8

At the hearing, McDuffie claimed that the situation was a misunderstanding and that the charge was dismissed. The government does not dispute that assertion. However, at the time Trooper Quinnell did not know the ultimate disposition of the Theft of Rental Vehicle charge.

Immediately after receiving the report, Trooper Quinnell relayed to the Avis representative that McDuffie "actually has a history of theft of a rental vehicle, felony." Trooper Quinnell asked the representative if Avis wanted the car seized. Trooper Quinnell then said, "He actually had a warrant issued in 2011 for stealing a rental vehicle." The representative responded that Avis wanted Trooper Quinnell to seize the vehicle. Trooper Quinnell told the representative that the car would be searched, provided his phone number, and gave the location where the car would be located. The call to Avis lasted about six minutes and twenty seconds.

About 23 minutes after he initiated the traffic stop, Trooper Quinnell approached McDuffie and asked him to step out of the vehicle. Trooper Quinnell told McDuffie that Avis wanted the car. Trooper Quinnell explained to McDuffie that his criminal history included a charge for theft of a rental car and that a warrant was previously issued for his arrest. Trooper Quinnell acknowledged to McDuffie that he did not know whether there was a conviction. McDuffie explained to Trooper Quinnell that the prior charge was a misunderstanding and things were resolved.

McDuffie tried to persuade Trooper Quinnell from seizing the vehicle and explained that his girlfriend was calling Avis and attempting to add him as an authorized driver. McDuffie denied having any drugs in the vehicle and gave consent to search. Trooper Quinnell again stated that the car was being seized, but that McDuffie was not detained and was free to go. McDuffie asked if he could remove his luggage, which was actually in the trunk. After searching the luggage, Trooper Quinnell allowed McDuffie to take it. Trooper Quinnell told McDuffie that Avis had his phone number, and that if McDuffie's girlfriend got things straightened out, Avis could call Trooper Quinnell and he would allow McDuffie to take the car.

Finally, around 35 minutes after Trooper Quinnell initiated the traffic stop, a Sheriff's Deputy drove McDuffie to a nearby bus station. Trooper Quinnell drove the rental vehicle to a Montana Highway Patrol garage. A subsequent search revealed methamphetamine, a scale, and plastic baggies concealed behind the stereo.

## II. Discussion

McDuffie makes two arguments in support of his motion. First, McDuffie argues that Trooper Quinnell did not possess reasonable suspicion to pull him over. Second, McDuffie argues that Trooper Quinnell unconstitutionally extended the traffic stop. The Court will separately address the arguments.

### A. Whether reasonable suspicion existed to stop McDuffie.

The Fourth Amendment allows police to conduct investigative traffic stops when the officers have "reasonable suspicion to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). The government has the burden of showing reasonable suspicion. *United States v. Coward*, 296 F.3d 176, 179 (3d Cir. 2002).

McDuffie challenges Trooper Quinnell's credibility and claims that he properly signaled when changing lanes and never crossed the center line. However, as discussed above, the Court finds Trooper Quinnell to be credible. Trooper Quinnell observed McDuffie change lanes without signaling and veer across the center line. Mont. Code Ann. § 61-8-336(1) prohibits changing lanes without an appropriate signal. § 61-8-328(1) requires cars to be "operated as nearly as practicable entirely within a single lane" and stay within the lane unless the driver first ascertains whether the move can be completed safely. Since Trooper Quinnell observed these traffic violations, the stop comported with the Fourth Amendment.

B. Whether the stop was justifiably extended.

McDuffie argues that Trooper Quinnell unreasonably extended the scope of the traffic stop from investigating a potentially fatigued driver into a drug investigation. McDuffie contends that Quinnell did not have sufficient, articulable facts to justify prolonging the stop until Avis asked him to seize the vehicle. Instead, McDuffie claims that Trooper Quinnell based his suspicion on the fact that McDuffie was an African American driving in the Bakken area. The government argues that Trooper Quinnell acted reasonably and diligently as he continued to gather facts during the course of the stop. The Court agrees with the government.

As discussed above, a traffic stop is a "seizure" within the meaning of the Fourth Amendment. *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014). A traffic stop may be extended where unfolding evidence supports a suspicion of criminal activity. *United States v. Rodgers*, 656 F.3d 1023, 1027 (9th Cir. 2011). In determining whether a traffic stop was impermissibly extended, courts consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

While the duration of the stop bears on the analysis, "there is no strict time limit." *United States v. Mayo*, 394 F.3d 1271, 1276 (9th Cir. 2005). Rather, as "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" *Brigham*

*City, Utah v. Stuart*, 547 U.S. 398, 403 (2006), "a fact-specific reasonableness inquiry is appropriate for Fourth Amendment questions." *United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008). The Court must examine the "totality of the circumstances" surrounding the stop to determine if the prolonged detention was unreasonable. *Id.*

Here, the Court finds that Trooper Quinnell acted diligently and that the length of the traffic stop was reasonable under the circumstances. Only 24 minutes elapsed from the time Trooper Quinnell stopped McDuffie until the investigatory stop developed into a full "seizure" of the rental car.[2] While he initially only suspected that McDuffie committed minor traffic violations, Trooper Quinnell developed sufficient facts to justify the prolonged detention. When Trooper Quinnell asked for the vehicle's paperwork, he noticed that McDuffie was not an authorized driver on the rental agreement. Trooper Quinnell, in his experience, believed that rental car companies did not want unauthorized individuals driving their rental cars. This belief was correct. At the very least, Trooper Quinnell had reasonable suspicion to believe that McDuffie was illegally driving the rental vehicle.

---

[2] McDuffie contends that the stop lasted 41 minutes. (Doc. 28 at 17). He apparently is basing this on the time that Trooper Quinnell physically took control of the rental car and drove it to the garage. The Court finds that the rental car was seized when Trooper Quinnell told McDuffie to exit the car and told him that Avis wanted the car seized. After that point, it was no longer an investigatory stop.

13

Trooper Quinnell also developed articulable facts to support a reasonable belief that McDuffie could have been involved in drug trafficking. In Trooper Quinnell's training and experience, drug traffickers sometimes travel in rental cars. Further, the car was rented to a third party that was not in the vehicle. McDuffie also appeared very tired and admitted to only stopping and sleeping in his car a couple of times. In Trooper Quinnell's training and experience, it is unusual for travelers to sleep in cars in January. Rather, it is indicative of criminal behavior.

In addition to having articulable facts to justify the prolonged stop, Trooper Quinnell acted diligently to either confirm or dispel his suspicions. When he returned to his patrol car after the initial encounter, he ran McDuffie's criminal history. It is reasonable for an officer to run computer checks on criminal history information, even if the driver's criminal history is not related to the initial reason for the stop. *United States v. Burleson*, 657 F.3d 1040, 1045 (10th Cir. 2011).

McDuffie argues that Trooper Quinnell's call to Agent Faycosh unreasonably prolonged the investigation into the rental agreement. However, the Court finds that the call was reasonable. First, the call was only two and half minutes long. Trooper Quinnell acted diligently when he called Agent Faycosh. Second, the Court does not fault Trooper Quinnell's solicitation of advice from a superior. As discussed above, Trooper Quinnell had articulable facts to believe

that McDuffie was transporting narcotics. Trooper Quinnell reasonably called the resident agent in charge of the Eastern Montana Drug Task Force.

After talking to Agent Faycosh, Trooper Quinnell diligently called Avis and relayed the relevant information. Trooper Quinnell did not yet have McDuffie's criminal history by the time he called Avis. Instead, he received the information in the middle of the call. This call took six minutes, with most of the delay attributable to Avis. After Avis asked Trooper Quinnell to seize the car, he promptly told McDuffie.

McDuffie criticizes Trooper Quinnell for telling Avis that McDuffie had a history involving stealing a rental car. McDuffie argues that Trooper Quinnell should have known that he was never convicted of that charge. However, Trooper Quinnell reasonably apprised Avis of this fact. Trooper Quinnell learned of the charge in the middle of the call. He simply read it to the Avis representative as it came in. As shown above, the disposition of that charge is not readily apparent. Further, Trooper Quinnell did not relay any false information. Soon after getting the report on his computer, Trooper Quinnell told the Avis representative that "he actually has a history of theft of a rental vehicle, felony." This statement was true, as it did appear in McDuffie's criminal history report. Trooper Quinnell never claimed that McDuffie was convicted on the charge. After asking the representative if Avis wanted him to seize the car, Trooper Quinnell said, "He

actually had a warrant issued in 2011 for stealing a rental vehicle." Again, that statement was factually accurate.

As final note, the Court does not find that the evidence supports McDuffie's claim that Trooper Quinnell was motivated by racial bias. Trooper Quinnell could not see McDuffie prior to pulling him over. As detailed above, objective facts supported prolonging the stop. The only evidence that McDuffie points to is when Trooper Quinnell identifies McDuffie as a "black male" in his call to Agent Faycosh. The Court agrees that taken in isolation, the comment appears odd. However, in the context of the entire call, identifying McDuffie as a "black male" is reasonable. Trooper Quinnell did not make that comment until the end of the call. Earlier in the call, Trooper Quinnell simply identified McDuffie as a "Nevada male." The Court finds it reasonable to provide a suspect's identifying characteristics. There is no evidence that suggests that Trooper Quinnell acted with racial bias.

In reviewing the totality of the circumstances, the Court finds that the investigatory stop was not unreasonably prolonged. The Ninth Circuit has held that an ordinary traffic stop could reasonably take 14 minutes. *Turvin*, 517 F.3d at 1102. Although McDuffie's traffic stop took longer than that, it was not an ordinary stop. Twenty-four minutes is a reasonable amount of time for a traffic stop when the driver of a car rented from Las Vegas is pulled over near Glendive,

Montana, and the driver is not listed on the rental agreement. Trooper Quinnell acted diligently to dispel or confirm his suspicions that McDuffie was impermissibly driving the rental car and trafficking narcotics.

**III. Conclusion**

For the foregoing reasons, McDuffie's Motion to Suppress (Doc. 17) is DENIED.

DATED this 13th day of January 2015.

SUSAN P. WATTERS
United States District Judge